Good morning, your honors. It is still morning. May it please the court, my name is Randy Pinal and I request, with the court's permission, to reserve five minutes for rebuttal. The state agrees with the district court's finding that the tribe's contractor was not acting as the tribe's agent and therefore was not entitled to tribal tax immunity. But we disagree with the district court's decision that, on balance, the federal and tribal interest in building a casino outweighed the state's interest in enforcing its tax laws, we ask this court to reverse the district court's judgment and find that the federal and tribal interest expressed in the Indian Gaming Regulatory Act do not preempt a state sales tax imposed on a non-Indian contractor that purchases materials for use in a lump-sum construction project because the contractor's purchase transaction is not a gaming activity. The tribe cannot voluntarily assume the contractor's tax liability and then turn to a non-Indian contractor just so it can save money on its construction project. First I'd like to discuss the contract in general and then I'll discuss why the Indian Gaming Regulatory Act, the Supreme Court's decision in Rama, and this Court's 1994 opinion in the Cabazon case do not apply. Yeah, well, you know, we've got, we've reviewed all this information, so see if we can do it in about ten minutes. I'll cut right to the chase then, your honor. In this case, the tribe admitted below that it was very unabashedly trying to save itself sales tax on a $75 million project, which I think ultimately turned out to be a $100 million project. And the way it tried to save its money, the tribe tried to save money was to tell its contractor, give us a low price that excludes the sales tax. And if the state comes after you for the sales tax, we'll indemnify you so you don't have to pay the tax. The district court, however, erred when it lost sight of what the state was really trying to tax here. Because this is a lump sum contract, the only taxable transaction is when Helix purchased its materials. Once it's determined to be a lump sum contract, anything that happened between Helix and the tribe is totally irrelevant. It doesn't matter that the materials were used to build... Where did Helix purchase the materials? Off the reservation? Helix purchased the materials from non-union businesses off the reservation. And the only reason we're here is because the tribe inserted itself, voluntarily inserted itself, into that purchase transaction between Helix and its vendors with some artful contract language in the contract between the tribe and the contractors that required all of the subcontractors' purchases to have the materials delivered to the reservation for the transactions to be complete. But it doesn't matter that the materials were delivered to the reservation because it's still a sale between the vendor and Helix. That the materials were delivered to Helix on the reservation doesn't change the fact that Helix made the purchase and Helix bore the legal incidence of the tax. Except for the agreement, right? The agreement. The agreement to... That the delivery would constitute the sale. That is a... That is a decision between the tribe and its contractors and subcontractors as to who bears the risk of what happens to those materials during transportation while they're being delivered to the reservation. It doesn't bear any weight at all upon the legal incidence test. And that's the real test that this court has to follow. And it also doesn't convert a tax on Helix into a tax on the tribe. And the tribe's insertion of itself into the transaction between the vendor and Helix didn't add any value to the transaction. Is it true that Helix would pass on the sales tax to the tribe? Absolutely not, Your Honor. And it's in the lump sum contract price? In the lump sum contract price, the sales tax was not included. It wasn't, but it could have been. It wasn't, but it could have been. And what the tribe is really trying to do here... The state doesn't care if it's a lump sum contract or a time and materials contract. All we care about is finding out who owes the tax and whether it's been paid. The tribe could have performed this contract under a time and materials contract, in which case... The tribe tried to have its cake and eat it too. It tried to create this hybrid contract where it got the benefit of the convenience and simplicity of a lump sum contract, combined with the tax exemption of a time and materials contract, without all the complex accounting and responsibility that comes with a time and materials contract. But as Justice Holmes once said, men must turn square corners when it comes to dealing with the government. And this tribe tried to cut corners six ways to Sunday. The state has a legitimate interest in setting up its tax scheme a certain way. And we all know that as taxpayers, if we want to get the benefit of a certain exemption, then we have to do it precisely the way the government has prescribed, otherwise we don't get it. That the tribe voluntarily agreed to indemnify the contractors is a significant point that the district court overlooked entirely. The tribe is not required by law to pay for the sales tax imposed on Helix, nor is it required to indemnify Helix. So it's incorrect to say that there is an economic burden on the tribe... But the contract itself would have been for a higher price had the subcontractors had to pay for the sales tax for the materials, right? I can only assume so, Your Honor. So then we get into the whole Bracker analysis. That's exactly where we are, yes. The Bracker balancing test. Right. And it's our position that the tribe cannot deliberately step in and assume Helix's tax liability with a hold harmless clause and then turn around and say, we're immune from taxation. This was nothing more than a risky business decision by the tribe that if upheld by this court, would allow any federally recognized tribe to cloak any non-Indian with bilateral agreement, even where the legal incidence of the tax falls on a non-Indian. And the Supreme Court has consistently said that tribes cannot do that. They cannot market their tax exemption to non-Indians where the purchase or sale would otherwise normally occur outside the reservation. And in this case, had the tribe not insisted that all the materials be delivered to the reservation, the sale would have normally occurred outside the reservation. So the tribe is trying to do exactly what the Supreme Court has said that it cannot do. And more importantly, though, the state has a compelling interest in enforcing its tax laws and preventing fraud. The state, like I said, doesn't have a preference for a lump sum contract or a time of materials contract. But if this district court's decision is upheld, it will open the floodgates to all sorts of fraudulent activity by contractors that have agreements like this with tribes because we don't know what the state has done. The state has made the contractor liable for the sales tax in these particular transactions to prevent this type of fraud and to prevent contractors from purchasing materials tax free. All we know is that they were delivered to the reservation. But Helix could have stockpiled the tax-free materials and used them for other non-tribal projects where it ordinarily would have had to pay sales tax. And on top of that, Helix could have padded its bid on some non-Indian projects and doubled its advantage. The state has made the contractor liable for the sales tax in these particular transactions to prevent this type of fraud and to prevent contractors from purchasing materials tax free under false pretenses. And one point I wanted to make, the last point I wanted to make on this particular topic is to assume that the tribe might ultimately bear the economic burden reflects a fundamental misunderstanding of what a lump sum contract is because in a lump sum contract, the contractor bears the risk if his costs go up. He cannot recover increased costs from the buyer. And in this case, the tribe conceded that oral argument below that it agreed to let Helix bear the burden of increased costs. So if Helix's costs go up because it has to pay the state sales tax, then that's an economic burden on Helix. But under a lump sum contract, Helix does not pass those costs on to the tribe. The next point I'd like to make is to explain why the Indian Gaming Regulatory Act does not express a federal interest in a taxable transaction here. The aspect of the most critical is that it regulates tribal gaming activities and nothing more. Although Helix purchased materials that ultimately went into building a casino and other buildings peripherally related to gaming, the actual purchase of materials is the taxable transaction and that is not a gaming activity. Two recent cases from the Eastern District and the Southern District of California are instructive. In County of Madera v. Picayune Rancheria, the Eastern District rejected the tribe's IGRA preemption argument because there was no explanation how the construction of a hotel and spa at the same location where the tribe operated its casino constituted a gaming activity. The Eastern District recognized that IGRA doesn't define gaming activity, but it does define three terms. The term is used in IGRA seems to mean the provision or playing of games defined in IGRA. The court found that IGRA didn't apply to hotel construction because the county was not trying to shut down the casino or otherwise interfere with the tribe's gaming operations. The other case out of the Southern District that says essentially the same thing is Kirsten v. Harris Casino. Both of those cases relied upon the Eighth Circuit's decision in the Dorsey and Whitney case, which we discussed in our reply brief. It stands for the proposition that the key question in determining IGRA preemption is whether the claim will interfere with the tribe's ability to conduct its gaming operation. And those cases are instructive here because the construction of a hotel, a casino, a parking structure, a wedding chapel, that is not a gaming activity. More importantly, the purchase of materials that go into building those facilities is not a gaming activity. The state is not trying to shut down the casino or dictate to the tribe that it can only operate a certain type of game or explain or restrict the tribe to how it plays its games. If we were trying to do that, then there would be a colorable argument that IGRA expresses a federal interest in the state's action here, but that's not what we have. This is a simple case about taxing the purchase of materials in a lump sum contract. It has nothing to do with the tribe's gaming activities. The state's notice of deficiency went directly to Helix? Pardon me, Your Honor? The state's notice of deficiency was directed at Helix? Yes, it was, Your Honor. There are two other decisions that strongly suggest that IGRA cannot be stretched to encompass the taxable transaction here, and that is the Supreme Court's decision in the Wagner case and the Second Circuit's decision in the St. Regis Mohawk case. In Wagner, two dissenting justices believed that selling gas at a tribal gas station located near the tribal casino that principally served tribal casino patrons furthered the tribal gaming enterprise and the federal interest in tribal economic development endorsed by IGRA, but the majority rejected that position by a 7-2 vote. And in the St. Regis Mohawk case, the Second Circuit held that a tribal casino construction contract did not require federal approval because it was outside IGRA's scope. If a tribal casino construction contract is not regulated by IGRA, then neither is the purchase of materials that go into building a tribal casino. I think we've got your arguments well in hand. Thank you, Your Honor. I will reserve the rest of my time for rebuttal. Good afternoon, Your Honor. There he is. Art Buntz, appearing for the Halili-Barona Band of Mission Indians. You may have pleased the Court. I'd like to try to shorten this by getting right to the point that Judge Fragerson suggested, the Bracker Balancing Test. The judge in the tribal and federal on one side outweighed the state interest in this case. If one conducts that analysis and concludes that that is so, then it's not necessary to determine anything about who bears the legal incidence of the test because the cases show that the legal incidence does not matter in that analysis. In this case, we know what the tribal interests are. They're The Indian Gaming Regulatory Act is a comprehensive federal regulatory scheme. That's certainly a factor in the analysis. The federal government, Secretary of Interior, did approve the compact under which the gaming occurs. The casino is located on a federal Indian reservation. The district court found as a fact that the sales in question occurred on a federal Indian reservation. Only because of the language in the services agreement. I think it went well beyond just the language in the agreement. There was extensive material submitted to the district court. Many invoices, purchase orders, testimony of all those involved. And after consideration of all of those things, the district court concluded a large section of its opinion with a holding that as a factual matter, the sales did occur on the reservation. It was well beyond just the recitation language. Well, I tell you what bothers me about this case is it just seems to me that the Indian tribes are trying to do an end run against the sales tax that would otherwise be legitimately owed by Helix through these side agreements. And I just find that a little bit unseemly. Because, you know, in point of fact, the sales did occur off the reservation and were purchased by a contractor who ordinarily, you know, probably would pass the costs on to the Indians. But that's the cost of construction. It has nothing to do with the gaming. It's anybody's cost of construction. Well, Your Honor, we believe it has a whole lot to do with the operation of gaming activities. The statute in question lists seven specific subjects which can be included in a compact between a state and a tribe. One of those is item seven, items that directly relate to operation of gaming activities. Now, that's much more broad than just the gaming itself. I can see if you're saying the tribe maybe doesn't have to pay for the actual slot machines or whatever that is actually used in the operation of gaming. What I don't see is the rationale for saying Helix doesn't have to pay for sales tax on lumber. All right. I believe, Your Honor, that the controlling law on the circuit is, from this case, this Court's opinion, in in-ring gaming-related cases in which this Court considered three specific items as to whether they were proper for inclusion in a compact or not. If they're proper for inclusion, they're within the preemptive scope of the statute. The payments into what's called the Revenue Sharing Trust Fund, payments into the Special Distribution Fund, and requirements of a certain kind of labor provision in the compact. The Court ruled that all three of those things were within the scope of directly related to operation of gaming activities. And the rationale, particularly for the labor relations thing, was the most telling. The panel's opinion in that case was that labor relations were part of operation of Indian gaming activities because without people to fill the jobs that would conduct the gaming, there wouldn't be any gaming. The same thing here. Without construction of a building in which to house the gaming, there wouldn't be any gaming. The Court has already construed that language from the statute broadly enough to cover that. And we believe that it still covers it here, particularly in the context of taxation. Taxation is one of the most sensitive subjects addressed in the Indian Gaming Regulatory Act. There are two provisions in the statute which address taxation specifically. One of them is a direct prohibition. A compact cannot include a request by a state to tax. The second is that even the request for such a tax in the negotiating process is itself evidence of bad faith on the part of the state. Those are both in the statute, and I believe we cite them both in the briefs. What did we just approve in Props? Was it 92, 93, and 94? Didn't we approve an tax? Yes, it is a tax, and the reason why it is a permitted tax, despite the language of the statute, is because the tribes got something of comparable value in return. The panel opinion in in-ring gaming-related cases in 2003 said that the two revenue streams, which were also taxes, just like the one in the current propositions, the two revenue streams negotiated from tribes to the were taxes, but they were permitted because they were not direct, freestanding, you know, revenue producers for the state. Instead, they were revenue to the state in return for something of comparable value that the state provided to the tribes. And what the state did provide to those tribes that wasn't comparable value was a major degree of exclusivity. There are no other persons in California authorized to operate Class III gaming, except to a limited extent the state lottery, but no one else is running slot machines or bank card games. Interesting to see the challenges. They inevitably will occur, Your Honor, and perhaps I'll be privileged to discuss them with you. So the exclusivity was one of the major items of value. There are also other provisions that the tribes received that were of considerable value, flowing from the constitutional amendment that was voted on, I think it was Proposition 1A, that legitimized the whole operation. So this court felt that it was permissible for the state to require those two revenue streams to go from the tribe to the state because they were not freestanding taxes. They were payments in return for something else of comparable value. With regard to the compacts that were just ratified by the voters two days ago, I'm somewhat familiar with them. I'm the general counsel to one of those four tribes. So I know what's in them. Yes, the tribes are paying a large, much increased degree of revenue to the state. That is true. But they also get something of great value back. Right now, the existing compacts say that the tribes can operate only 2,000 slot machines. The four compacts that were just approved by the voters authorized those four tribes to increase their number of slot machines up to 5,000 in some cases and 7,500 in others. That is a major concession on the part of the state. In return for that, the tribes are paying quite a bit of revenue. I assume that under the analysis of in-ring and in-game related cases that those would be permissible payments. They would not be forbidden taxes. And I assume that the Secretary of the Interior, who approved the first round of compacts, and has also approved the second, would agree. Now, that's where we are in this particular case. We have a compact, only one, but the current tribe is not one of the new ones whose compacts were voted on by the state that says, state, you will get two revenue streams. You will get the revenue sharing trust fund. You will get the special distribution fund. That's it. There's no other taxes being paid aside from a few little incidental reimbursements of a few regulatory costs, costs about which there's no dispute. If the state had wished, it could have asked for a third revenue stream in return for some other provision of comparable value. It didn't. And I this court's cases, starting with the Saquon versus Roche case, through the two Tabazon cases, through the Shoshone-Bannock case, which was decided a year or so ago by this court, in every one of them, the court held that if the state had not bargained for something from a tribe in a compact, it didn't get it. Perhaps the most instructive is the Shoshone-Bannock case, decided by this court in late 2006. In that particular case, the state was trying to get a tax out of a tribe that was not provided for in a compact. And the panel said simply that, you didn't negotiate for it. You don't get it. I know, but where I'm hung up on is still that what the state's trying to tax is Helix and its business and the things it purchases in connection with its business, regardless of who the, you know, whether it's an Indian tribe or, you know, some other casino business that is the end-run user of it. Well, to the extent that the state is saying that because you didn't structure your transactions the way that we want you to structure it, therefore, you can't get the exemption. I think that that really is an illusory argument. And the reason for that is that there are, if you read the briefing, you'll see that there are two sets of state regulations referred to. I think 15- I didn't read the brief, but I did. Yes. 1521 is the general state regulation on contractors and sales taxes, and 1616 is the regulation solely on federal areas, including Indian reservations. The critical language out of 1521 says, in all cases, contractors can either do lump-sum contracts or they can do this time and materials, and here are the various consequences. That's the general regulation for all construction contracts. Then there's also the separate regulation, 1616, which pertains to Indian reservations only. And the difficulty with that is that that regulation, which we assume is the one that applies here because the specific prevails over the general, that one does not allow this to occur. If you read the language from 1616, it does not allow for the kind of distinction that we're talking about here. It specifically says under part, that regulation 1616, D4C2, which I'm sure that the court has committed to memory, the language is non-Indian contractors. Sales tax applies to sales of materials to non-Indian contractors, notwithstanding the delivery of the materials on the reservation and the permanent attachment of the materials to realty. Period. It does not distinguish between lump-sum contracts and time and material contracts. Even if that distinction exists as a general matter, for normal contractors, for contractors on federal Indian reservations, there is no such exemption available. And that's why this tribe had to try to do what it could to try to escape, frankly, a state tax, which it didn't want to pay for two reasons. First reason is the obvious one. Increase cost to try to save some money. But that's not the only one. When I wrote the briefs in this case, I purposely laid out for the court the prior history of this tribe in the state of California. This tribe has been before this court four times in the past because in each one of those four instances, the state was trying to assert some kind of control or jurisdiction that the court eventually found did not exist. The tribe is very fearful that that's what's happening again here. If the state succeeds in imposing the sales tax in this case, what one will be next? Will there be an income tax demand? Will there be another demand for regulation of land use with regard to the siting of another casino or another structure on the reservation? Will there be some other kind of letter coming in from some state agency saying you haven't complied with this state law? Do you see what I mean? It's very important to this tribe to hold the state of California to the benefit of its bargain. And I believe that the panel in the Cabazon cases, the two Cabazon cases, was very emphatic about that. That in those particular cases, even though, again, you had a non-Indian entity on which the incidence of the tax fell. In that case, it was the racing associations. The district court in that case said that the tax is not preempted because the incidence of the tax falls on the racing associations because what you're really selling here is horse racing. The horse racing happens off, you know, San Anita or someplace like that. It doesn't happen on the reservations. This court reversed. This court reversed saying it is not necessary that all aspects of the activity in question occur on the reservation. It is sufficient if the tribe has made a major investment and it has a major active role in conduct of the gaming on the reservation. And also the fact that the incidence of the tax falls on a non-Indian does not matter. Federal law still preempts the tax. And that's one of, and this tribe, the Verona Band, is, was one of the main plaintiffs or plaintiff intervenors in Cabazon 2. That's really what the tribe's motivation here is. The tribe was very pleased with the panel's decision in Cabazon 2 because not only did it prevail, but because of the mode of analysis. The opinion begins and ends with saying that we intend to hold the state to its bargain. That's what this tribe is trying to do in this particular case. The tribe, having been the victim of overreaching by the very state in the past, is afraid that this particular attempt at taxation is going to be a prelude to another attempt. And we would very much like to continue to have the court reaffirm the position that it took in the original Saquon versus Roach case, which I argued here in 94, through the Cabazon cases, and the court repeated again in 06 in the Shoshone-Bannock case, that the bargain is the bargain. The state gets exactly what the state bargains for and what the compact says. And even if the compact doesn't address a subject, if it's the kind of subject that could have been in the compact but wasn't, the state didn't get it. And that is really the most defensible position for the tribe, because the tribe has been the victim of state overreaching on many occasions in the past, including raids by sheriffs and many other things which have harmed it in other ways. Remember here that this Indian tribe is not just a commercial party trying to conduct business and make money. Certainly there is that aspect to it, but that's not all that this Indian tribe is. This Indian tribe is a sovereign government. It is a proud people. It is the remnant of the original inhabitants of the Capuchin Grand Valley in San Diego County. Those folks were displaced by active Congress because the city of San Diego wished to essentially flood their reservation for the benefit of the city of San Diego. Congress authorized that back in a time when tribes had very little ability to stop such things, back in 1932. I think we described that in the brief. The tribe was displaced once for the benefit of the city of San Diego from having a reservation that was its ancestral territory along the banks of a free-flowing river to the present reservation which, despite its current beauty, has no water. It has no other resources. I mean, unless you're going to run a few skinny cattle, there's not much else you can do up there. This tribe is doing the very best it can to support its people. It uses the revenues from its gaming to support a fire project, a fire department, which we didn't have before. We're sending kids to school. We have a health insurance program that we're very proud of. It's because the tribe uses revenues for governmental purposes, even though they may be generated in a way that looks commercial. This is why I hope the court will view this as an attempt by one government, the California state government, to intrude an area that the federal government has set aside and said, this area here, the Indian Gaming Regulatory Act and all the items that either are regulated directly by the statute itself or indirectly related by the statute by being within the scope of the kinds of things that can be included in a compact, these things are where the state cannot intrude. And if the state wishes to intrude in this area, it has to be by negotiation between the state government and the tribal government. That did occur with regard to the Revenue Sharing Trust Fund. It did occur with regard to the Special Distribution Fund, but it did not occur with regard to sales tax. If the state had brought up sales tax during the negotiation process, I expect the tribe would have said, okay, what do you propose to offer us in return for that? And if the state had come up with something reasonable in return, there would have been a third revenue stream in the compact. And I know that because I'm one of those who negotiated the compacts. I was there. I helped do it. But that's really what the tribe is trying to do here. Not only just to save money in the crass sense that any economic party might, but to try to protect its dignity and its honor as a government, to get the state of California to deal with it as an equal sovereign. The Indie Gaming Regulatory Act sets that up and allows it to occur. In the past, this court has not allowed what you might call another kind of end run around the statute by the state when it's trying to do other things, such as when it was trying to raid the casino in the absence of a compact in 94, when it was trying to tax the simulcast operation in the two Cabazon cases, and when the Shawnee Bannock tribes had the same difficulty with the state of Idaho trying to extract another revenue stream from it. This tribe is trying to do the same thing, to preserve its ability to know that its deal is its deal. Now, in this context, we believe that the Bracker balancing test, no matter where the instance of the tax may be, is still met in this case. We know what the tribal interests are. They're all the ones identified by the district court and the additional one that I just described to the court. The state interests, we believe, are weak. If the court looks at the nexus cases, the Hoopa Valley case and the others, and even the second Cabazon case, the nexus of the tribe that this court has required to exist between a state tax and even a non-Indian entity, such as the horse racing associations in the Cabazon cases, has to pertain to the activity being taxed. In this case, the activity being taxed is the purchase of construction materials for construction of various structures on a federal Indian reservation. That occurs on the reservation. The state has pointed to no services whatsoever or cost that occurs with regards to that activity. Well, I think we get your argument, and certainly I will go back and look at all of those cases, that line of cases that you've just cited. You're over your time. Maybe we should hear what the state has briefly to say in response. Thank you, Your Honor. Thank you. Thank you for a very interesting argument. And I will be very brief, Your Honor. Counsel suggested that legal incidence doesn't matter and that economic burden is the proper test, but the Supreme Court and this court in recent cases have placed less emphasis upon economic burden. In Chickasaw Nation and Wagner, the Supreme Court's most recent Indian tax case, the court said that the initial and frequently dispositive question in the Indian tax cases is who bears the legal incidence. The court has also said that a state tax is not invalid simply because it has an adverse effect on a tribe's finances. In Yalapai-Prescott, this court relied upon Chickasaw Nation and rejected the economic burden approach, insisting instead that legal incidence was the proper test. It's undisputed that Helix bore the legal incidence here, so whether the tribe may have been burdened, and there's no evidence that the tribe's gaming operation was burdened, but even if that's true, that fact alone is not compelling. Another point that counsel raised that I would like to briefly address is that he suggested that IGRA prohibits attacks, and I agree that IGRA prohibits attacks on a gaming activity, but counsel seems to suggest that IGRA prohibits attacks, period. As I've indicated, this is not attacks on the tribe and it's not directed at the gaming activity. Counsel also suggested that if the state wanted to collect this sales tax, it should have included this in the compact negotiations. There are several reasons why that statement is false. First, it's not attacks on the tribe, it's attacks on Helix. The second is the compact addresses the regulation of gaming activities, and the taxable transaction here is not a gaming activity, and the state's ability to tax a non-Indian contractor for materials purchased under a lump-sum contract, even where the materials are delivered to the reservation, that has existed in the law since 1978, so any discussion in the compact would have been redundant. In fact, quite the opposite is true, because the compact is based on existing law, so if the tribe... What's happened in the past? I mean, I'm sure there's been other construction contracts. There have been... I cannot speak to what the State Board of Equalization has done with other construction contracts before this one, but I do know that other tribes have approached the board and asked for permission to do exactly what the Barona tribe did and said that's not the way to do it. You have to do it under a time and materials contract process. That exemption exists, that process exists, and the tribe would not have to pay state sales tax if it were to pursue its project under a time and materials contract. And that was my final point as to why the sales tax didn't have to be included in the compact, because the tribe already has an avenue for purchasing the materials tax-free. The last point I would like to make is to distinguish the Cabazon case, which I think the tribe relies heavily upon. The tribal investments in Cabazon, the building, the satellite waging facility, importing the signal, all of those things led up to the tribe operating the satellite waging facility, which was the activity being taxed there. In this case, however, the tribe did nothing that led up to the purchase of the materials that went into the construction project. That was Helix's purchase, that was Helix's transaction. The tribe had no ownership or management interest in Helix. The materials were made, sold, and delivered by non-Indian vendors to Helix. It was a lump-sum contract, so the tribe didn't direct Helix to purchase a certain quantity or quality of materials. There simply was no tribal expertise that went into selling or purchasing the materials. Cabazon is, and I'll just very quickly, Cabazon is also distinguishable because it involved a direct taxation by the state on an Indian gaming activity, which is not what we have here. And in Cabazon, the state directly interfered with an Indian gaming revenue stream that was generated by tribal activities that took place on the reservation. But in this case, the state seeks to tax a sales transaction that occurred between two non-Indian businesses, but for this artful contract language requiring the materials to be delivered to the reservation would have otherwise occurred off the reservation. Also, since Cabazon was decided, this court has Ingle, Pipe, Prescott, and Gila River, too, and the Salt River case has placed less emphasis upon the economic burden and greater emphasis upon the legal incidents. And, Your Honors, I just want to conclude by saying that this is a simple tax case. It has nothing to do with Indian gaming. It has nothing to do with tribal sovereign immunity. This case is all about the tribe trying to save money by inducing its contractors to cheat the state out of a lawful, non-discriminatory sales tax, and the Supreme Court has said that tribes cannot do that, and we ask this court to do the same. Thank you. All right. Thank you, counsel. It was an excellent argument. And I guess we'll, that's submitted, and we'll take the next one.
judges: Pregerson, Wardlaw, Archer